Sandra BALLESTEROS, Appellant,

v.

James K. JONES and The Law Offices of Mann & Jones, Appellees.

No. 04–91–00568–CV.

Court of Appeals of Texas, San Antonio.

Nov. 18, 1998.

Rehearing Overruled Jan. 26, 1999.

Marvin B. Zimmerman, Zimmerman & Zimmerman, P.C., San Antonio, Oscar C. Ganzales, Oscar C. Gonzales, Inc., San Antonio, John M. Pinckney, III, Wells, Pinckney & McHugh, P.C., San Antonio, Judith R. Blakeway, Strasburber & Price, L.L.P., San Antonio, for Appellant.

Timothy Patton, Pozza & Patton, San Antonio, Harlin C.Womble, Jr., Jordan & Shaw, P.C., Corpus Christi, for Appellees.

Before PHIL HARDBERGER, Chief Justice, TOM RICKHOFF, Justice, ALMA L. LÓPEZ, Justice, CATHERINE STONE, Justice, PAUL W. GREEN, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, en banc.

## OPINION ON APPELLEE'S MOTION FOR REHEARING EN BANC

KAREN ANGELINI, Justice.

Appellee's motion for rehearing en banc is granted and the motion to resubmit is denied. Our opinion of September 29, 1993 and judgment of July 28, 1993 are withdrawn, and the following opinion and judgment are substituted.

### Nature of the case

This is an appeal of a judgment notwithstanding the verdict in a legal malpractice and deceptive trade practices suit. Appel-

lant, Sandra Ballesteros, filed suit against appellees, James K. Jones and the Law Offices of Mann and Jones (collectively referred to as "Jones"), asserting that the settlement Jones had obtained on her behalf in a suit to establish a common law marriage and for divorce against Andres Monetou was inadequate and that Jones had charged her an excessive fee. The jury found that a common law marriage had existed between Ballesteros and Monetou, and found that Jones was negligent and had acted unconscionably. The trial court granted Jones's motion for judgment notwithstanding the verdict. Ballesteros filed this appeal.

■ To sustain the trial court's action in entering a judgment notwithstanding the verdict, the reviewing court must determine that there is no evidence to support the jury's findings. *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670, 671 (Tex.1990); *Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309 (Tex.1986). "In making this determination, we view the evidence in the light most favorable to the jury's findings, considering only the evidence and inferences which support them, and rejecting the evidence and inferences contrary to those findings." *Navarette,* 706 S.W.2d at 309. It is error to grant a judgment notwithstanding the verdict when there is more than a scintilla of evidence to support the jury's finding. *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 228 (Tex.1990).

■ In order to prevail on a legal malpractice claim which arises from prior litigation, the plaintiff has the burden to show that "but for" the attorney's negligence, he or she would be entitled to judgment, and show what amount would have been collectible had he or she recovered the judgment. *Cosgrove v. Grimes,* 774 S.W.2d 662, 666 (Tex.1989); *Hall v. Rutherford,* 911 S.W.2d 422, 424 (Tex. App.—San Antonio 1995, writ denied); *Jackson v. Urban, Coolidge, Pennington & Scott,* 516 S.W.2d 948, 949 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.). This is commonly referred to as the "suit within a suit" requirement.

■ Because the plaintiff must establish that the underlying suit would have been won "but for" the attorney's breach of duty, this "suit within a suit" requirement is necessarily a component of the plaintiff's burden on cause in fact. However, the plaintiff only has the burden to prove a "suit within a suit" in a negligence claim. Plaintiffs need not prove the "suit within a suit" element when suing an attorney under the DTPA. *Latham v. Castillo,* 972 S.W.2d 66, 69 (Tex.1998).

Because Ballesteros alleged that Jones was negligent, the trial court correctly applied the "suit within a suit" concept when the first jury question asked if a common law marriage existed between Ballesteros and Monetou.

### Common Law Marriage

■ In her first point of error, Ballesteros argues that the trial court erred in granting Jones's motion for judgment notwithstanding the verdict because the evidence was legally sufficient to support the jury's finding of a common law marriage. We agree.

■ A valid common law marriage consists of three elements: (1) an agreement presently to be husband and wife; (2) living together in Texas as husband and wife; and (3) representing to others in Texas that they are married. *Russell v. Russell,* 865 S.W.2d 929, 932 (Tex.1993); TEX. FAM.CODE ANN. § 1.91(a)(2) (Vernon 1993).[1] All three elements must exist at the same time. *Bolash v. Heid,* 733 S.W.2d 698, 699 (Tex.App.—San Antonio 1987, no writ).

Viewing the evidence as we are required to do under the applicable standard of review, the facts pertaining to the alleged common law marriage are as follows. Monetou and Ballesteros began living together in 1970. Both were married to other persons at the time. Their relationship lasted 17 years. Shortly after the relationship began, Ballesteros and her husband divorced. In 1975, Ballesteros gave birth to a son fathered by Monetou. They named their son Andres, Jr.

---

1. Act of June 2, 1969, 61st Leg., R.S., ch. 888, § 1.91, 1969 Tex. Gen. Laws 2707, 2717 (repealed 1997) (current version at TEX. FAM.CODE ANN. § 2.401(a)(2) (Vernon Pamph.1998)). Section 1.19 was repealed and reenacted as section 2.401(a)(2) without substantive change.

Monetou's wife died in 1980. In 1983, Monetou legitimized his son by a decree of paternity. The decree recited that Monetou and Ballesteros were living together at the same address in Laredo. During their relationship, Ballesteros and Monetou traveled together and would sign hotel and airline documents "Mr. and Mrs. Monetou." Monetou supported Ballesteros, Andres, Jr., and Ballesteros's two other sons financially. Ballesteros testified that her older son considered Monetou a hero and that her second son called him "daddy."

According to Ballesteros, she and Monetou cohabited three or four times a week in Laredo, although Monetou also spent some time at his Nuevo Laredo residence with his other children. Monetou kept clothes at the house in Laredo; he would bathe, shave, and eat there; and he invited his other children over for visits and meals. Monetou paid for improvements to the house in Laredo. At times, Monetou and Ballesteros traveled together, accompanied by Monetou's other children. Monetou gave Ballesteros a diamond ring and a wedding band which she continued to wear after Monetou's wife died. Monetou introduced Ballesteros to others as his wife. They held themselves out as husband and wife in Laredo and while traveling. Monetou co-signed promissory notes for Ballesteros, including one that allowed her to pay off the mortgage on the house in Laredo that she and Andres, Jr. had shared with Monetou.

Ballesteros testified that after Monetou's wife died, she and Monetou began spending more time together and that he moved his clothes into the house in Laredo and would stay there. During this time, according to Ballesteros, they also held themselves out to others as being married to one another. She testified that at this time they entered into an agreement to be married. We consider this as some evidence of the existence of an agreement to be married. *Collora v. Navarro,* 574 S.W.2d 65, 70 (Tex.1978); *Winfield v. Renfro,* 821 S.W.2d 640, 645 (Tex.App.—Houston [1st Dist.] 1991, writ denied); *Bolash,* 733 S.W.2d at 699. Furthermore, the

agreement to be married may be shown by circumstantial evidence or conduct of the parties. *Russell,* 865 S.W.2d at 933. Proof of cohabitation and representing to others that they were married may constitute circumstantial evidence from which a jury could find an agreement to be married. *See id.*

■ Jones argues that Monetou and Ballesteros could not be engaged in a common law marriage because the relationship was illicit in its origin. If an impediment to the creation of a lawful marriage between the parties exists, as when one is married to another, there can be no common law marriage, even if all three elements are proven. *Howard v. Howard,* 459 S.W.2d 901, 904 (Tex.Civ.App.—Houston [1st Dist.] 1970, no writ). However, an ongoing agreement to be married may be shown by the circumstantial evidence of the parties continuing to live together as husband and wife and holding themselves out to others as being married after the removal of the impediment. TEX. FAM.CODE ANN. § 2.22 (Vernon 1993)[2]; *Garduno v. Garduno,* 760 S.W.2d 735, 741 (Tex. App.—Corpus Christi 1988, no writ). There is evidence that the parties lived together as husband and wife and represented themselves to others as being married after Monetou's wife died. As we have indicated, Ballesteros testified that at the time of the death of Monetou's wife they entered into an agreement to be married. This is some evidence of the required agreement.

Looking at the evidence in the light most favorable to the jury's findings, we find some evidence to support the jury's finding that Ballesteros and Monetou were engaged in a common law marriage. Thus, the evidence is legally sufficient and the motion for judgment notwithstanding the verdict was improper on this issue. We sustain the first point of error.

Jones argues in his first two cross-points that the evidence is factually insufficient to support the jury's common law marriage finding. In considering a factual insufficiency challenge, we must consider and weigh all the evidence and reverse for a new trial only

---

**2.** Act of June 2, 1969, 61st Leg., R.S., ch. 888, § 2.22, 1969 Tex. Gen. Laws 2707, 2719 (repealed 1997) (current version at TEX. FAM.CODE

ANN. § 6.202 (Vernon Pamph.1998)). Section 2.22 was repealed and reenacted as section 6.202 without substantive change.

if the challenged finding is so against the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We may not substitute our opinion for that of the jury merely because we would have reached a different result. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex.1986).

Jones first contends that the evidence is factually insufficient on the requirement of holding out. The common law marriage requirement of holding out can be established by word or conduct. *Estate of Giessel,* 734 S.W.2d 27, 31 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). Proof of holding out requires that it be done in Texas. Tex. Fam.Code Ann. § 1.91(a)(2) (Vernon 1993).[3] Jones argues that the vast majority of the trips where Monetou and Ballesteros registered at hotels and with airlines as a married couple were in other states and in Mexico. Monetou denied that he represented to anyone else that he and Ballesteros were husband and wife. He testified that most of the reservations were in the name of "Mr. and Mrs. Monetou" because Ballesteros made them. The promissory notes that Monetou co-signed were signed after the relationship ended and were in Ballesteros's name. The couple never filed income tax returns as husband and wife.

Monetou did acknowledge, however, that numerous trips he and Ballesteros took were within the State of Texas and many of these trips occurred after the death of his wife. Monetou testified he had signed in at hotels as "Mr. and Mrs. Monetou." He also admitted giving Ballesteros a diamond ring and a wedding band, which she wore after his wife's death. Bruce Adams, a business associate of Monetou, testified that after Monetou's wife died, Monetou introduced Ballesteros as his wife not only to him but also to customers in Adams's warehouse in Laredo. Adams testified that on business trips he took with Monetou and Ballesteros, Monetou would introduce Ballesteros as his wife. Monetou testified that he co-signed one of the promissory notes to allow Ballesteros to pay off the mortgage on her house in Laredo so she and his son could keep the house.

Jones next contends that the proof of cohabitation is factually insufficient. The evidence showed that Monetou is a Mexican national whose permanent residence is in Nuevo Laredo. Although he visited Ballesteros frequently at her Laredo home and spent as much as a week at a time with her there, he testified that he never intended to live with Ballesteros permanently in Laredo. He also testified that he saw other women during the time of his relationship with Ballesteros and thought she knew about this.

We find the evidence of Monetou's and Ballesteros's living and family arrangements in Laredo sufficient to establish the cohabitation element of a common law marriage. Monetou's business associate, Adams, testified that he went to their house in Laredo on numerous occasions in the evenings and saw Monetou there. He further testified that Monetou gave him the phone number of the Laredo house so that he could call Monetou there at night. In fact, Adams reached Monetou there by phone in the evenings. The evidence shows that Monetou stayed at the house in Laredo on a regular basis. Although he did frequently return to his house in Nuevo Laredo where the children of his first marriage lived, this in itself is not sufficient to destroy the pattern of living together. *See Bolash,* 733 S.W.2d at 699 (finding evidence that the man, employed in Nigeria, stayed at the woman's residence during his periodic visits to Texas was sufficient to support the finding that they lived together as husband and wife "to the extent possible under the circumstances"). The decree legitimizing Andres, Jr. lists both parties as living at the same address in Laredo. Considering all the evidence as a whole, there is evidence of more than merely isolated instances of living together. Thus, we view the evidence as sufficient to establish holding out and cohabitation.

Finally, Jones challenges the sufficiency of the evidence to support the agreement ele-

---

3. Act of June 2, 1969, 61st Leg., R.S., ch. 888, § 1.91, 1969 Tex. Gen. Laws 2707, 2717 (repealed 1997) (current version at Tex. Fam.Code Ann. § 2.401(a)(2) (Vernon Pamph.1998)). Section 1.19 was repealed and reenacted as section 2.401(a)(2) without substantive change.

ment of a common law marriage. He refers to testimony by Monetou that he never intended to marry Ballesteros, that he told her he would not marry her, and that he made a conscious decision not to marry her when he acknowledged paternity of his child. Jones also points out that Monetou was to be ceremonially married to another woman on the day that he was served with Ballesteros's suit. Jones contends that this evidence indicated that Monetou never considered himself to be married to Ballesteros. Finally, there was testimony that Monetou hired prostitutes, sometimes flying them in from as far away as Mexico City, to engage in lesbian sex with Ballesteros while he watched. Although Ballesteros testified that she was not a willing participant in these activities, she also testified that the relationship ended when she would no longer satisfy Monetou's desires. Jones argues that this conduct is inconsistent with a man intending to transform an "illicit affair" into a marriage.

We have already detailed Ballesteros's evidence regarding the agreement element of a common law marriage. The jury believed Ballesteros. The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 28 (Tex.1993). It may resolve conflicts or inconsistencies in the testimony. *Barrajas v. VIA Metro. Transit Auth.*, 945 S.W.2d 207, 209 (Tex. App.—San Antonio 1997, no writ). We cannot say the jury's finding of a common law marriage is so against the overwhelming weight of the evidence as to be clearly wrong and unjust. We find that the evidence was factually sufficient. Therefore, we overrule Jones's first and second cross-points.

### Legal Malpractice and DTPA

In the remainder of her points, Ballesteros argues that the evidence was legally sufficient to support the jury verdict in her favor on legal malpractice, violation of the DTPA, and damages. Jones brings a number of cross-points, contending that if we reverse the judgment notwithstanding the verdict, we should remand for a new trial because the charge was defective and because the evidence was factually insufficient to support the jury's legal malpractice and DTPA findings.

A review of the evidence in the light most favorable to the jury's findings shows that in the summer of 1988, Ballesteros consulted with attorney Shirley Hale because she wanted to file for divorce. Ms. Hale advised Ballesteros to request a monthly allowance until divorce papers were filed. At that point, Monetou and Ballesteros agreed she would not file for divorce and he would provide her with $1500 a month allowance. Shortly thereafter, Ballesteros became aware that Monetou was getting married. She then contacted Jones about getting a divorce. She had, on a previous occasion, talked to Jones about her common law marriage, and he told her if she ever decided to leave Monetou, she could get a divorce. Jones requested a $10,000 retainer, but Ballesteros told him she did not have the money. Instead, Ballesteros gave Jones $3,000 and she signed an agreement with Jones that stated: "for and in consideration of the services which the firm shall provide, it shall receive one-third (⅓) of any money or property awarded to me."

Ballesteros spoke with Jones for about six hours about the case on January 12, 1989. Before the hearing, Ballesteros told Jones about having sex with other women in order to please Monetou. According to Ballesteros, Jones said that they could use the information about Monetou's sexual appetites to "hang him." He told Ballesteros he had handled another divorce case in Laredo that was probably worse than hers. After discussions in the judge's chambers before the hearing, Jones related to Ballesteros that Monetou had offered to settle for $100,000. Jones said that the offer was not good enough and recommended that she settle for $300,000. At that time, Ballesteros had no idea of Monetou's net worth.

Within a few days the parties reached a settlement. According to Ballesteros, Jones told her it was a wonderful agreement and that she was rich woman. He told her it would be better for her to settle because a jury would find against a common law marriage based on the sexual encounters with other women. Jones testified that he be-

lieved a jury would not believe that a man would treat his wife that way. Based on these representations by Jones, Ballesteros approved the settlement agreement, relinquishing her claims to a marriage with Monetou and, therefore, her claims to any community property.

The settlement agreement, dated March 8, 1989, provided that Ballesteros would receive $90,000 in cash; Monetou would pay three promissory notes dated June and August 1988 in the principal amounts of $10,000, $65,000, and $69,573.55. The three notes represented debts on Ballesteros's house and business. Additionally, he would relinquish all interest in International Van Storage, the business operated by Ballesteros, and two lots in Laredo. Monetou would pay Ballesteros $1400 per month for life, secured by a lien on a warehouse in Laredo. In return, Ballesteros agreed to dismiss the divorce suit with prejudice. A certified public accountant valued the settlement at $384,839.

When Ballesteros originally told Jones about the sexual encounters, she was willing and unafraid to go to court. According to Ballesteros, she would not have signed the settlement agreement had she known the extent of Monetou's assets. At the time the parties signed the settlement agreement, there was no discussion about Jones's fee. Later, when the checks came in, Jones told her he would take his fee out of the cash, which she understood would be one-third of the $90,000. Jones gave her a check for the first $1400 monthly payment and asked her to endorse the $90,000 check over to him. Jones said he would give her the balance as soon as expenses were cleared. When she left Jones's office, Ballesteros was under the belief she would receive $60,000 from Jones.

Approximately one week later, Jones's receptionist contacted Ballesteros and told her they had a check for her. When Ballesteros went to Jones's office, she was given a check for $88.45 and an invoice. The invoice reflected that the amount was the balance from the $3,000 deposit she had given Jones. Ballesteros stated she was in shock after realizing she received $88.45 out of a $90,000 cash settlement. She wrote Jones asking him to reconsider his fee because of her desperate

financial situation and indicated that time was of the essence. Ballesteros was then arrested for writing hot checks. After Ballesteros was released, she went to see Jones and he told her that the $90,000 was actually a reduced fee. He explained that under the contract, he was entitled to take one-third of the money and property she had received, which would be much more than $90,000. He told her they could go back to the original agreement but it would end up costing her more.

At the time she signed the settlement agreement, Ballesteros was unaware of what property she might be entitled to. Although the temporary injunction provided for an inventory, Jones never obtained one. Jones also never took Monetou's deposition nor did he hire an investigator to do an asset search. Jones also never made a settlement demand. Jones did check the county tax assessor's office and determined that Monetou had no property in his name in Webb County. Jones said he did not think the first offer of settlement was worth taking, not because of any knowledge of Monetou's assets, but because he generally does not feel the first offer is worth taking in any litigation. In fact, Monetou did have extensive real property and business holdings in Texas and Mexico. At the time of the settlement, he had a $900,000 certificate of deposit and $15,000 to $20,000 in his checking account in a Laredo bank. Monetou estimated his net worth at that time was approximately $2,000,000.

Ballesteros sued Jones under the DTPA alleging that his conduct in coercing her to settle her cause of action without determining the size of the estate acquired by the parties during their common law marriage resulted in a gross disparity between the value received and what she should have received. She sued him for negligence and gross negligence in failing to investigate properly and determine the full extent of the assets owned by the community; failing to require Monetou to file an inventory; failing to perform routine discovery; failing to discover marital assets prior to settlement; failing to obtain a settlement which would award her an equitable portion of the community property; failing to protect her rights by

dismissing her case and by agreeing to entry of an order that declared no marriage existed; and charging her an unconscionable attorney's fee.

In addition to finding that a common law marriage existed, the jury found that Jones knowingly engaged in unconscionable conduct that was a producing cause of Ballesteros's damages, that he was negligent and that his negligence was a proximate cause of her damages, and that he was grossly negligent. The jury awarded Ballesteros $560,000 in actual damages. She was awarded $60,000 for mental anguish, $100,000 in additional damages under the DTPA, and $200,000 as exemplary damages. She was also awarded attorney's fees of $100,000 through trial, $15,000 for appeals, $10,000 for making or responding to a writ of error to the supreme court, and $5,000 if the writ were granted.

### Negligence

In her fourth point of error, Ballesteros alleges that the court erred in granting a judgment notwithstanding the verdict because the evidence was legally sufficient to support the jury's finding of legal malpractice. In Jones's fourth cross-point, he contends that the evidence was factually insufficient to support the jury's findings of liability.

A legal malpractice action is based on negligence. *Cosgrove,* 774 S.W.2d at 664. To prove that Jones breached the standard of care and thus was negligent, Ballesteros called two family law practitioners, Christine Tharp and Frank Pennypacker, as expert witnesses. Because both Tharp and Pennypacker are San Antonio lawyers, Jones in his fourth reply point, objects to their qualifications to express opinions concerning the standard of care applicable to an attorney practicing in Webb County. In *Cook v. Irion,* 409 S.W.2d 475, 478 (Tex.Civ.App.—San Antonio 1966, no writ), this court noted that an attorney practicing in a vastly different locality would not be qualified to second guess the judgment of an experienced attorney as to who should be joined as additional party defendants. In that malpractice action against an El Paso attorney, an attorney from Alpine was called as an expert witness.

The opinion noted that Alpine was 220 miles from El Paso and that the population of Brewster County was 6,434, as compared to 314,070 in El Paso County. *Id.* The Alpine attorney had never tried a case in El Paso County. *Id.* at 477. Therefore, rather than testifying as to the care, skill, and diligence customarily exercised by El Paso County attorneys, he testified, over objection, concerning the requisite standard of care of the average general practitioner in Texas. *Id.* Jones points out that neither Tharp nor Pennypacker had ever tried a case, picked a jury, appeared before a judge, or participated in a contested evidentiary matter in Webb County. The attorneys testified that they were familiar with the standard of care required of a Webb County practitioner because they had worked on cases out of Webb County, they had consulted with Webb County attorneys and San Antonio attorneys who practice extensively in Webb County, they had consulted Webb County court personnel about local customs, and they had practiced before judges who try cases in Webb County. Tharp testified that she had tried cases before the trial judge in this case.

■ A party offering expert testimony has the burden to show that the witness is qualified, that is, that the witness possesses a higher degree of knowledge or skill than an ordinary person and that the knowledge or skill will assist the trier of fact. Tex.R. Civ. Evid. 702. Whether a witness qualifies as an expert is left to the discretion of the trial court, and its decision will not be overturned absent a clear abuse of discretion. *Broders v. Heise,* 924 S.W.2d 148, 151 (Tex.1996).

■ The charge in this case limited its definitions of negligence, ordinary care, and proximate cause to Webb County. Thus, the question is whether Ballesteros's experts were competent to address the standard of care existing in the Webb County legal community. Despite the fact that neither Tharp nor Pennypacker were Webb County practitioners, the trial court acted well within its discretion in allowing these two attorneys to testify as experts. They testified to having experience that allowed them to become familiar with the standard of care by which a Webb County practitioner should be judged.

Thus, Ballesteros met the threshold burden of showing that her experts possessed greater knowledge, skill, experience, and training than the jury, and that they were familiar with the standard of care that should exist in the Webb County legal community. At that point, the weight and credibility of the testimony was for the jury to determine. *ITT Commercial Fin. Corp. v. Riehn,* 796 S.W.2d 248, 250 (Tex.App.—Dallas 1990, no writ).

■ An attorney in Texas is held to the standard of care that would be exercised by a reasonably prudent attorney. *Cosgrove,* 774 S.W.2d at 664. The standard is an objective exercise of professional judgment. *Id.* at 665. Jones complains in his third cross-point that the negligence instruction was fundamentally defective because it failed to set out the *Cosgrove* standard of liability. He requested the following instruction:

> If an attorney makes a decision which a reasonably prudent attorney could make in the same or similar circumstances, it is not an act of negligence even if the result is undesirable. An attorney who makes a reasonable decision in the handling of a case is not negligent simply because the decision later proves to be imperfect.

This language tracks language from *Cosgrove. See id.* The terms "negligence" and "ordinary care" were defined in the charge as follows:

> "Negligence," when used with respect to the conduct of James K. Jones, Jr., d/b/a/ Law Offices of Mann & Jones, means failure to use ordinary care, that is, failing to do that which an attorney of ordinary prudence would have done under the same or similar circumstances in Webb County, or doing that which an attorney of ordinary prudence would not have done under the same or similar circumstances in Webb County.
>
> "Ordinary care," when used with respect to the conduct of James K. Jones, Jr., d/b/a Law Offices of Mann & Jones, means the degree of care that an attorney of ordinary prudence could use under the same or similar circumstances in Webb County.

In *Cosgrove,* the Supreme Court said that the instruction "should clearly set out the standard for negligence in terms which encompass the attorney's reasonableness in choosing one course of action over another." *Id.* The instructions in this case set out the proper standard of liability. In fact, the instruction sets out the standard in greater detail than the instruction reviewed in *Cosgrove. See id.* Cross-point three is overruled.

■ In addressing Ballesteros's fourth point of error and Jones's fourth cross-point, we find that there was expert testimony that Jones was negligent in failing to investigate properly the full extent of the assets owned by Monetou and Ballesteros at the time of the settlement, in failing to require Monetou to file a sworn inventory, and in failing to get an equitable portion of the marital estate for Ballesteros. Jones argues that he had no duty to conduct discovery because he counseled Ballesteros concerning whether to forego legally available objectives or methods. Ballesteros testified, however, that Jones never told her about an inventory or any other discovery device. According to Ballesteros's experts, Jones could not have competently advised her to forego what she was foregoing since he had no idea of the extent of Monetou's assets. Ballesteros's experts testified it would have been a simple matter under Texas discovery rules to obtain information; he could have obtained an inventory, he could have taken depositions, he could have hired an investigator. A reasonably prudent attorney could not have advised his client to accept a settlement under these circumstances. Having reviewed the evidence in the light most favorable to the jury finding, we find some evidence from which a jury could conclude that Jones was negligent in his representation of Ballesteros. Thus, we find the evidence legally sufficient and sustain Ballesteros's fourth point of error. Looking at all the evidence, we also find that the jury's finding of negligence is not so against the overwhelming weight of the evidence as to be clearly wrong and unjust. Thus, the evidence is factually sufficient to support the jury's finding of negligence.

### Unconscionability

In her second point of error, Ballesteros argues that the court erred in granting a

judgment notwithstanding the verdict because there was legally sufficient evidence to support the jury's finding that Jones acted unconscionably, and did so knowingly. In Jones's fourth cross-point, he contends that the evidence was factually insufficient to support the jury's findings of liability.

The jury found that Jones engaged in an unconscionable action or course of action that was a producing cause of damages to Ballesteros. Unconscionable action or course of action means an act or practice which, to a person's detriment:

(A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or

(B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

TEX. BUS. & COM.CODE ANN. § 17.45(5) (Vernon 1987).[4] A lawyer's unconscionable conduct is actionable under the DTPA. *See Latham*, 972 S.W.2d at 68, *DeBakey v. Staggs*, 612 S.W.2d 924, 925 (Tex.1981). A showing under subparagraph A of section 17.45(5), that the defendant took advantage of a consumer's lack of knowledge to a grossly unfair degree, does not depend on the defendant's intent. It requires a showing that the resulting unfairness was "glaringly noticeable, flagrant, complete, and unmitigated." *Chastain v. Koonce*, 700 S.W.2d 579, 584 (Tex.1985).

In the recent case of *Latham v. Castillo*, the Texas Supreme Court discussed unconscionable conduct under the DTPA in a legal malpractice case. In *Latham*, the plaintiffs retained an attorney to file a medical malpractice claim against a hospital for causing the death of their young daughter. *Latham*, 972 S.W.2d at 67. The plaintiffs sued the attorney for negligence because he failed to file the lawsuit within the statute of limitations. *Id.* The plaintiffs also alleged unconscionable action under the DTPA because the attorney affirmatively represented to them that he had filed the lawsuit. Additionally, the plaintiffs alleged fraudulent misrepresentation and breach of contract. After the plaintiffs presented their case, the judge granted a directed verdict that the plaintiffs take nothing from the attorney. *Id.* Presumably, the judge granted the directed verdict because the plaintiffs offered no evidence that "but for" the attorney's negligence the medical malpractice suit would have been successful and damages would have been recoverable and collectible. The court of appeals affirmed the directed verdict on negligence and the plaintiffs did not appeal that issue. The court of appeals remanded the remaining issues. The supreme court found that the plaintiffs had offered some evidence on all elements of their DTPA cause of action. *Id.* at 70.

As in our case, the plaintiffs in *Latham* argued that the lawyer's conduct was an "unconscionable action or course of action." The supreme court stated that the legislature enacted the DTPA to protect consumers against false, misleading, and deceptive business practices and unconscionable actions. "Attorneys can be found to have engaged in unconscionable conduct by the way they represent their clients." *Id.* at 68. In *Latham*, the plaintiffs depended on the attorney to file their suit and the record reveals that the attorney told the plaintiffs he had filed the claim when actually he had not. The court stated that the attorney took advantage of the trust his clients placed in him as an attorney and found some evidence that the clients were taken advantage of to a grossly unfair degree. *Id.* at 69. The attorney argued that the plaintiffs' DTPA claim was essentially a dressed-up legal malpractice claim and the plaintiffs should have proven that they would have won the medical malpractice case in order to recover. *Id.* The court disagreed and stated that recasting the plaintiffs' claims as merely a legal malpractice claim would subvert the legislature's clear purpose of deterring deceptive practices. *Id.* The court stated that if the plaintiffs had only alleged that the attorney negligently failed to file their claim, the claim would only be one for legal malpractice. "It is the difference between negligent conduct and deceptive conduct. To recast this claim as one for legal malpractice is to ignore this

---

4. *See* Act of May 10, 1977, 65th Leg., R.S., ch. 216, § 1, 1977 Tex. Gen. Laws 600 (amended 1995) (current version at TEX. BUS. & COM.CODE ANN. § 17.45(5) (Vernon Supp.1998)).

distinction." *Id.* The court concluded that the DTPA does not require the "suit within a suit" element when suing an attorney under the DTPA. *Id.*

Both of Ballesteros's experts testified that $90,000 for the amount of work performed on the case was clearly excessive and unconscionable. Tharp testified that in her opinion Jones had done only about $3,500 worth of work. Jones's own records show he spent 52 hours on the case, in addition to 65 hours of associate's time. This averages out to a fee of $769.23 per hour. Tharp, a board certified family law specialist, testified that her hourly rate is $125. Both experts testified that contingent fee contracts in divorce actions, while not illegal, are not recommended and lead to an automatic conflict of interest between the attorney and client.

■ We cannot approve of contingent fee contracts in traditional divorce actions for the reasons mentioned by Ballesteros's experts. Further, while not in effect when the present agreement was signed, our code of Professional Conduct is also instructive regarding the policy reasons that disfavor such fee arrangements in certain kinds of family law litigation.

> Contingent and percentage fees in family law matters may tend to promote divorce and may be inconsistent with a lawyer's obligation to encourage reconciliation. Such fee arrangements also may tend to create a conflict of interest between lawyer and client regarding the appraisal of assets obtained for client. See also Rule 1.08(h). In certain family law matters, such as child custody and adoption, no res is created to fund a fee. Because of the human relationships involved and the unique character of the proceedings, contingent fee arrangements in domestic relations cases are rarely justified.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04 cmt. 9, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon Supp.1998) (TEX. STATE BAR R. art. X, § 9). This case, however, was not a traditional divorce action since a recovery by the plaintiff depended on the establishment first of a common law marriage. While rarely justified in divorce actions, contingent fee contracts may be appropriate in a situation such as this. If the marriage is not established, the plaintiff may recover nothing, a situation differing sharply from a divorce suit involving a ceremonial marriage in which each party will obtain a recovery of some sort. The contingency fee contract between Jones and Ballesteros is valid and enforceable. Further, a one-third contingent fee contract is not excessive. *See Kuhn, Collins & Rash v. Reynolds,* 614 S.W.2d 854, 857 (Tex.Civ.App.—Texarkana 1981, writ ref'd n.r.e.). We therefore cannot say that there is a glaring and flagrant disparity between the fee paid by Ballesteros and the value of the services received.

■ We hold that the evidence is legally and factually insufficient to support a finding for Ballesteros under section 17.45(5)(B). Because we find that the fee was not unconscionable, we must find evidence, other than the fee agreement, to support the jury's finding under 17.45(5)(A). Therefore, we must find evidence that Jones took advantage of the lack of knowledge, ability, experience, or capacity of Ballesteros to a grossly unfair degree.

In her amended petition, Ballesteros alleges that the unconscionable conduct was the excessive fee Jones received in relation to the work he performed and the results he obtained. Ballesteros's experts testified that the fee was excessive and unconscionable. The record shows that the focus of Ballesteros's unconscionability claim was the fee agreement. In her brief, Ballesteros's unconscionability argument concerns the excessive attorney's fee issue. There was testimony from Ballesteros's experts, however, that Jones (1) failed to obtain a divorce for Ballesteros; (2) failed to obtain an inventory; and (3) urged a settlement without discovery of assets. They opined that this conduct constituted negligence and gross negligence. Thus, apart from the fee issue, evidence of Jones's negligence would also have to support the jury finding on unconscionability.

The Supreme Court in *Latham* drew a clear distinction between negligent conduct, which gives rise to recovery for the "suit within a suit" type of legal malpractice, and deceptive conduct which gives rise to recov-

ery under the DTPA for unconscionability and does not require the "suit within a suit" element. As the court stated in *Latham*, if the plaintiffs had only alleged that Latham negligently failed to timely file their claim, their claim would properly be one for legal malpractice. In this case Ballesteros alleged and offered proof that Jones was negligent in his representation of her and charged an unconscionable fee. There is no evidence that any of Jones's conduct amounts to anything more than negligence, which the supreme court in *Latham* said would require the "suit within a suit" proof. There is no evidence that this negligent conduct was deceptive conduct as contemplated by the supreme court in *Latham*. To find unconscionable conduct in this case would require recasting the negligence claim as a DTPA claim.[5]

Thus, we find the evidence legally and factually insufficient to support a finding for Ballesteros under section 17.45(5)(A). We find that the judgment notwithstanding the verdict was proper because there is no evidence to support the jury's finding on unconscionability. We overrule Ballesteros's second point of error and sustain Jones's fourth cross-point with regards to the jury's finding on unconscionability.

Having found insufficient evidence of unconscionability, we need not address Ballesteros's remaining points of error concerning the sufficiency of the evidence to support a "knowing" violation of the DTPA, the award of mental anguish damages, and additional damages because they are dependent upon a finding of unconscionability. We affirm the judgment notwithstanding the verdict, that Ballesteros take nothing by way of her DTPA claim.

### Damages

In her sixth point of error, Ballesteros alleges that the evidence was legally sufficient to support the jury's award of actual damages. Jones argues in his fifth reply point that Ballesteros has waived her right to challenge the judgment notwithstanding the verdict as it relates to the damages question.

In its answer to question six, the jury awarded Ballesteros $560,000 in actual damages, representing (1) the difference in the value of the settlement she received and the value of the settlement she should have received if her suit had been properly prosecuted, and (2) the difference between the value of services rendered by her attorney and the amount of attorney's fees she paid.[6]

Jones's motion for judgment notwithstanding the verdict rested on several independent grounds. Because the trial court's judgment did not specify which grounds it was granted on, Ballesteros had the burden to establish that the judgment could not be supported on any of the grounds

---

5. Although not applicable to this case, the DTPA was amended as of September 1, 1995. The DTPA no longer applies to a "claim for damages based on the rendering of professional service, the essence of which is the providing of advice, judgment, opinion, or similar professional skill." Tex. Bus. & Com.Code Ann. § 17.49(c) (Vernon Supp.1998). However, an attorney may still be liable for an unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion. *Id.* § 17.49(c)(3). The amendment supports the idea that unconscionable action is more than negligent conduct.

6. Question 6 reads:
What sum of money, if any, if paid in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Sandra Ballesteros for her damages, if any resulting from the conduct of James K. Jones, Jr., d/b/a Law Office of Mann & Jones?
Consider the following elements of damages and none other. Do not include interest on any amount of damages you find.

a. The difference in value of the settlement received by Sandra Ballesteros in her cause of action against Andres Monetou because of the conduct of James K. Jones, Jr., d/b/a Law Offices of Mann & Jones and the value of the settlement that she should have received had her suit been properly prosecuted. The difference in value, if any, shall be determined at the time and place the settlement was made.
b. The difference, if any between the attorney's fees charged Sandra Ballesteros by James K. Jones, Jr., for services performed in connection with the settlement of Sandra Ballesteros' claims against Andres Monetou and the value of those services. The difference in value, if any, shall be determined at the time and place the settlement was made.
Answer in dollars and cents for damages, if any.
Answer: $560,000.00

set out in Jones's motion. *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex.1991); *Monk v. Dallas Brake & Clutch Serv. Co., Inc.,* 697 S.W.2d 780, 783–84 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). Otherwise, Ballesteros has waived her right to question any ground not challenged. *Monk,* 697 S.W.2d at 784. Jones contends that Ballesteros has failed to challenge the grounds asserted in paragraph three of his motion.

■ Ballesteros, on the other hand, argues that Jones has waived his complaint because he failed to object to the charge on the ground urged in his motion for judgment notwithstanding the verdict. An objection to the charge based on legal insufficiency of the evidence is not a prerequisite for a post-verdict motion for judgment notwithstanding the verdict. *City of San Antonio v. Theis,* 554 S.W.2d 278, 281 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.), *cert. denied,* 439 U.S. 807, 99 S.Ct. 64, 58 L.Ed.2d 100 (1978); Tex.R. Civ. P. 279.

■ Jones's complaints, however, are not related to the sufficiency of the evidence. He raises two complaints in paragraph three of his motion. Jones's initial complaint is that the answer to question 6(a) is immaterial because it asks the jury to decide a question of law—the value of the settlement Ballesteros would have received in a successful divorce action. Jones was not required to object to the charge to complain subsequently that a finding is immaterial. *See Carey v. American Gen. Fire & Cas. Co.,* 827 S.W.2d 631, 632 (Tex.App.—Beaumont 1992, writ denied). A question erroneously calling on the jury to answer a question of law is classified as immaterial. *See Cortimeglia v. Davis,* 116 Tex. 412, 292 S.W. 875, 876 (1927); *Portwood v. Buckalew,* 521 S.W.2d 904, 912 (Tex.Civ.App.—Tyler 1975, writ ref'd n.r.e.). Jones has not waived this argument.

■ But we also hold that Ballesteros has not waived hers. She argued in her brief that the evidence is legally sufficient to support the jury's finding of damages and that the judgment should be entered on the jury's verdict. This must necessarily be viewed as an argument that it is the jury's function to determine the amount of those damages, and not a question of law for the court. Such an argument, of course, correctly states the law. *See Westinghouse Elec. Corp. v. Pierce,* 153 Tex. 527, 271 S.W.2d 422, 425 (1954) (amount of damages in a negligence case is a jury question); *Country Roads, Inc. v. Witt,* 737 S.W.2d 362, 365 (Tex.App.—Houston [14th Dist.] 1987, no writ) (amount of unliquidated damages rests primarily within the discretion of the jury). The case before us is not a divorce case in which a trial court must divide the marital estate. *See* Tex. Fam. Code Ann. § 3.63 (Vernon 1993).[7] Rather, this is a legal malpractice and DTPA case in which the amount of damages sustained by the plaintiff is a fact issue. *See Cosgrove,* 774 S.W.2d at 666 (judgment rendered that plaintiff recover actual damages in accordance with jury verdict); *Schlosser v. Tropoli,* 609 S.W.2d 255, 259 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.) (jury question properly submitted actual damages issue in legal malpractice case).

■ Jones's second complaint in paragraph three of his motion is that disparate elements of the damages issue are improperly intermingled in a single answer. He argues that matters properly for the jury's determination (the difference between the attorney's fees charged and the value of the attorney services provided) are improperly intermingled with matters only the court could decide (the amount Ballesteros should have recovered in her divorce action). Intermingling is an error that is waived by failure to object to the charge. *See Matthews v. Candlewood Builders, Inc.,* 685 S.W.2d 649, 650 (Tex.1985); *Ked–Wick Corp. v. Levinton,* 681 S.W.2d 851, 855 (Tex.App.—Houston [14th Dist.] 1984, no writ); Tex.R. Civ. P. 274. It is not necessary to challenge an argument waived by one's opponent. Even if this argument were not waived, Ballesteros's legal sufficiency argument must again be viewed as a challenge to Jones's assertion

7. Act of June 2, 1969, 61st Leg., R.S., ch. 888, § 3.63, 1969 Tex. Gen. Laws 2707, 2725 (repealed 1997) (current version at Tex. Fam.Code Ann. § 7.001 (Vernon Pamph.1998)). Section 3.63 was repealed and reenacted as section 7.001 without substantive change.

that the actual damages are for the court alone to decide. Reply point five is overruled.

 In his fifth cross-point, Jones argues that question six improperly submitted the damage element because it failed to set forth the element of "collectibility." In a legal malpractice suit based on negligence, the plaintiff is required to establish that any judgment that would have been obtained in the underlying action, but for the attorney's breach of duty, would have been collectible. *See Cosgrove*, 774 S.W.2d at 666. Jones objected to the omission of the collectibility element. Although, a separate question on collectibility is not required, that element must either be included in the damages question itself or it must be included in an instruction. *See Scholsser*, 609 S.W.2d at 258–59. The measure of damages submitted by the trial court was clearly erroneous because it failed to limit the jury's consideration to the amount Ballesteros could have collected from Monetou in a settlement.

Ballesteros had the burden of requesting a jury question on the proper measure of damages. *W.O. Bankston Nissan, Inc. v. Walters*, 754 S.W.2d 127, 128 (Tex. 1988). A question that fails to guide the jury on any proper legal measure of damages is fatally defective. *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 90 (Tex.1973). Remand for a new trial is required. *See Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 166 (Tex.1982); *Id.*

A separate trial on unliquidated damages alone, however, may not be ordered if liability is contested. Tex.R.App. P. 44.1(b); *Paragon Hotel Corp. v. Ramirez*, 783 S.W.2d 654, 662 (Tex.App.—El Paso 1989, writ denied). Because in this case the damages are unliquidated and the liability issues are contested, remand of the negligence claim is required. *Id.* We sustain Jones's fifth cross-point.

We need not address Ballesteros's remaining points concerning the sufficiency of the evidence to support the finding of gross negligence and the exemplary damages award because they are conditioned upon a finding of negligence.

We affirm the judgment in part, that Ballesteros take nothing from Jones on her claim of unconscionability under the DTPA. We reverse and remand the judgment in part for a new trial on negligence.